The next case for argument 2244 Libertarian Party of New York v. New York State Board of Elections Good morning, Your Honors. May it please the Court, I'm James Ostrowski. I represent the Libertarians and the Green Party. I think it's important to understand that before this statute was passed, New York wasn't exactly known for its competitive elections. We have people sitting in the state legislature literally for generations. One's been there since I was in 8th grade. But this, and even the ballot access standards that we're talking about today, if you look at the affidavit of Richard Winger, who's really probably the most knowledgeable person who's been publishing on this for decades, he stated that even before these statutes, these statutory changes were made, it was very difficult to get on the ballot. The Libertarian Party, again, since I was in high school, they were trying to get on the ballot, and Winger points out, it's the third largest party in the country, they were on the ballot in 41 states before New York. The Green Party, they needed a celebrity, and that's sort of a continuing theme, I hope, in this argument, that you have to be kind of a celebrity or a billionaire to get by these laws, with very few exceptions. But now we know for certain that the legal position we've been urging all along has been vindicated by the facts. In 2020, the non-fusion parties were wiped out, and I would like to get in, in my time, to talk about that issue of fusion parties. I think it's really central. It sounds to me like you're making an argument that should be made to the legislature and not to us. We're looking at the changes that were made by this law and comparing them presumably to the situation that existed when the old law was passed, and in terms of percentages and that kind of thing. Your Honor, we're here pursuant to the First Amendment primarily, and we strongly- Regardless of what limits are set by the state. Not an absolute right, but in this case, this was summary judgment. It was up to the defendants to prove that there were no issues of fact, and they failed to do that. They failed to do that with respect to the first element of Anderson, which is virtual exclusion from the ballot. We know that the non-fusion, I'm sorry. That's a fact question? I mean, we know that any threshold of signatures for vote in the past election has the potential to disqualify anyone who's below it, right? Yes. That's going to happen. Yes, Your Honor. So falling below it can't show that it was an unconstitutional line. Well, I think you have to look at the strictness of New York's laws when you take all of the different elements, for example, and these are pointed out in the affidavit of Mr. Wenger. You take all the different elements together, the drastic increase in the requirement of votes, 130,000, the tripling of the signature requirement, and by the way, all seven parties tried to get on the ballot, including one of the major party candidates with those resources, failed to get on the ballot. So at some point, and we've reached that point here, the right of the state to regulate the ballot has resulted in what? Well, that still sounds like an argument that if we don't get on the ballot, that shows the line is too high. No. Our point is, Your Honor, that everybody has been wiped out, and these minor parties that are not fusing. Maybe because everybody failed to meet a reasonable line. The wipeout doesn't prove the line is too high. When you have the third and fourth largest parties in the country fail to get on the ballot under the. . . Third and fourth largest parties in the country don't have enough support to get on a ballot. Well, Your Honor, I think they do have the support. They moved the goalpost on us, frankly. I understand they moved. There's no question they moved the goalpost. That's what the case is all about. The question is, did they move it too far? We contend that the Anderson test was not met on summary judgment. It's virtual. What do you understand is the standard for determining whether a prior vote or signature requirement is unconstitutional? What's the test? The first test is virtual exclusion from the ballot, Your Honor. And if you look at the fact that with one obscure party in the 40s, the Labor Party or something like that, you look at all the people who surmounted even the old challenges, they're generally speaking either an actress, since Cynthia Nixon was signatures, Al Lewis from the Munsters, Golisano, billionaire, Perot, billionaire, Ralph Nader, household name celebrity. When you have to be a celebrity, an actress, or a billionaire, I don't think we could submit any further evidence that New York's ballot access law violates the First Amendment. And let me point out, these are not parties that like the conservative party wants to share power and they want to move the Republican Party a couple degrees to the right, or the working families, they want to share power, maybe get some of their people in office. The Greens and the Libertarians, these are ideological parties. They don't care about getting somebody in office, they want to change the conversation, and they have changed the conversation in this country. And I would point to the example of marijuana legalization, which is touted by both parties, green energy, clean energy, without, and I think... Now you're telling us what a commendable party they are. What I'm saying is under Anderson, the value of the First Amendment here is to allow these parties to interject new ideas so that the voters can consider those, and ultimately, as we know in political science, the main function... Supposing another party is formed tomorrow with the most meritorious platform you could possibly imagine, and at the last election they only get a quarter of one percent of the vote, so they flunk. Is that unconstitutional? Not in and of itself, but the Libertarians and the Greens, they passed the test, and as we pointed out in the brief... I mean, they passed it in the past. They passed the test that had existed before this... And now it's a bigger state, and they have a higher threshold. That's not necessarily under Anderson and Burdick. You can't just verbally say that there's more voters. You have to weigh those... I take your point. A bigger state doesn't mean you get to set the line anywhere. And that's why my first question was, what's the standard for determining whether the line is too high? The standard is, A, virtual exclusion from the ballot, and even if that's not met, which we think it has been by the results of the petition drive and the results of the 2020 election, you still have to get into a complicated analysis, which we contend the district judge did not do, and this is laid out in our brief in detail, of weighing these interests and then determining the burden on the plaintiff's First Amendment rights. So weighing the interests, what interests are being weighed? Well, the ballot clutter, for example, the cost of administering elections, the cost of public financing. It's our contention that, again, on summary judgment, the defendant did not remove all issues of fact on whether those are serious interests, and the court did not weigh... For example, take ballot clutter. Is the jury going to be asked to decide is there too much cluttering or not enough cluttering? I don't know if this is going to go to a jury or not. A fact finding, whether judge or jury. I think juries and judges on bench trials decide things way more complicated than that. Why is it fact finding? Why aren't the facts of how many parties are on the ballot beyond dispute? You could take judicial notice. All you've got to do is look at a ballot. Isn't it whether this is unconstitutional? It's our contention, Your Honor, that these are pretexts, and if you got into a detailed analysis of them at a non-jury trial, for example, we would find out that this is kind of an illusory consideration. Is this, I mean, this is, we're not, well, I don't know whether or not you're suggesting we're in the area of strict scrutiny or not. I mean, I think part of what I'm struggling with is we have to have a way to assess these restrictions prospectively. It can't simply be that, well, this party was on previously and now they're not, and so it's a problem. And so in looking at what the cases say in terms of how we determine whether or not restrictions are too strict, I take your point in the briefs about not simply comparing numbers and what have you, but we have to have some kind of standard for deciding whether or not these restrictions are okay. And I guess I'm still, I'm wanting to hear from you what that is beyond, you know, saying virtual exclusion. Okay, that doesn't really give us something to, going forward, to determine whether or not these restrictions are okay. Your Honor, all I can say in terms of the standard is the Anderson verdict test, the level one is strict scrutiny is triggered by virtual exclusion from the ballot. But even if that's not true, it requires a very complicated way. Do we even have, though, the virtual exclusion from the ballot? Well, I would just point to this election where there's only two candidates. I think it's the first time with maybe one exception in a vast number of years. And the problem is, again- Can I just ask you, I'm sorry? Sure. Is the question about access to the ballot for candidates or for parties? Because I know you appear to take the position that, well, fusion parties don't count. And so it's about, or is that your position? I think it's very clear that it has to do with the field of candidates. So in other words, and that's from Anderson. So in other words, the fact that the Republican candidate is also on a conservative line, as a conservative he's not going to say anything that he's not going to say as a Republican, because he's just one person. So there's a drastic reduction in the infusion of new ideas, and this is into the political marketplace, which I pointed out again, both of these parties have actually gotten their ideas out there, been co-opted to some extent, but that's what happens in third party politics. So there's a drastic, there's a sterility in the political discourse this year, with one major party candidate and another major party candidate, and there's no, the Greens and the Libertarians who are loaded with interesting ideas, some from the left, some from the right, some from the middle, they're on the sidelines. So ultimately who's suffering here is not my clients, it's the voters who are just going to have, it's like going to a diner, are you going to have a cheeseburger or a veggie burger? The voters deserve to have a menu that's a bit more complex than, I'm not casting any aspersions on the candidates. But that doesn't tell us anything about the standards. That just, again, you're just arguing we didn't make it, and I thought we agreed that can't be the sole test. It's not the sole test, although we feel that. Let's put it this way. Is there a difference between ending up below the threshold and virtual exclusion? Are those different or the same? I think that you can find virtual exclusion by looking at the fact that the non-fusion parties were wiped out, and again this year on the petition. Wiped out, well, it's a dramatic phrase. Doesn't it just mean ended up below the threshold? Below the threshold, and without a- And I thought we agreed that can't be the test of unconstitutionality. Otherwise, the threshold would be a half a percent, and the party only got a quarter of a percent, and they would say, well, we were wiped out. It's a fact-intensive evaluation, Your Honor. I can't give you a particular formula other than we're trying to follow the Anderson verdict standards, and again it was- Well, I understand you're quoting that case, and we've looked at it. I must say it's not a model of clarity with all respect to the others. So that's why I want to know what you think is the standard, and we all do, I think, and we're trying to have you say what the standard is by which I think we mean something other than we didn't get on the ballot. Well, again, it's a complicated standard because it's a- Yes, it is, and it's vague. I don't think the case law is very cohesive in this area, so I'm inviting you to tell us the standard. I agree with you, Your Honor, and I'm obviously not the one to produce the case law, but in an area- You're in perfect position to tell us what you want us to say the standard is. The standard is virtual exclusion from the ballot, which we think there's at least an issue of fact to get to trial. And what does that mean other than not getting on the ballot? It means you have to do a fact-intensive analysis of how difficult it is to get on the ballot in New York in comparison to other states. Didn't Judge Codal do that? I mean, Judge Codal, I don't know about comparison to other states, but he went through a rather elaborate analysis of how many volunteers it would take to petitioners would take to get the signatures and that kind of thing. And how many hours and how many days it might take. And he found that this was not unduly burdensome. Well, I don't think it was really up to the judge to put in the factual predicate for summary judgment. I think that was my colleague's job. And although the employee of the Board of Elections is a superb employee, he's not an expert in petition drives. And if you look at the affidavit, for example, of Mark Axson and the other detailed affidavits, that analysis was done and basically stated we don't have enough money. The Greens and Libertarians don't have enough money to meet this standard. And guess what? They didn't meet the standard, although there's some litigation ongoing. Yeah, but not having enough money, again, can't be the test. Otherwise, some little party with only $8 in the bank says we don't have enough money to hire even six people. That can't be they win. But we have a, Your Honor, again, in an area where the law is murky, we have a basis of experience that shows that many parties have gotten on the ballot temporarily and then faded away. They've risen to the occasion. They've raised enough money. They've got enough volunteers to get enough petitions to get on the ballot. But it's not a constant thing. And the fact that there's insufficient money to hire people to collect the signatures is an indication of a lack of public support. But it's not because, again, these are the third and fourth largest parties in the United States. Somehow they miraculously seem to have the support in Montana and Florida and Ohio. And, again, I think that's the empirical basis where in an admittedly murky area of law, I think it should be a fact-intensive inquiry calling for a bench trial. Can you tell me just one fact that you think is in dispute here? The difficulty of, well, one of the things that Mr. Winger does in his affidavit is he takes all of the ballot restrictions together and not separately as the district court did and shows that New York is an extremely difficult place to get on the ballot. What's the fact there? That's a legal conclusion. Well, maybe it's not even legal. That's a conclusion that it's difficult. Is that a fact, whether it's difficult? Well, there are factual assertions in five extremely detailed affidavits, and I don't think my colleague is going to stand up here and agree with those facts. So I think it is an issue of fact calling for a trial. Could you just isolate one so I know what you're talking about? Tell me a nice disputed fact that's in his affidavit. The shortage of time of getting on the ballot and maybe that's not – But that's not in dispute, is it? There's a time interval. It's either one week, two weeks, six weeks. Whatever it is, it's an interval. The question is, does it fail to meet the standard of either unreasonableness or burdensomeness or whatever? But the time limit is undisputed, right? It's not disputed. There's some differences of interpretation between our expert and their expert. Interpretation about what the limit is? What the time limit is? I believe there are, and our affidavit by Richard Winger takes issue with some of the conclusions of Mr. Brum. I know, but you were focusing on the time limit. Is that – I can't – maybe. Is it in dispute? If somebody says it's six weeks and nobody else says no, it's only three weeks? But how do you weigh the time limit in conjunction with the fact that the voter cannot sign twice? I mean, those are two facts, but the law requires, Anderson verdict, that all of these factors be considered together, and I think that is a murky area requiring a trial, the weighing of those disparate facts. Okay. Thank you. We have a little – we have two minutes for rebuttal. Good morning, Your Honors. My name is Elliot Hallock from the law firm of Paris Beach. I have the pleasure of representing the Board of Elections in this case. To understand what this case is really about, we need to start with the understanding that states have the obligation to enact laws for an orderly electoral process. As Your Honors pointed out, there is no constitutional right to either party status or ballot access, which are two different things. States may and inevitably must require that parties and candidates demonstrate some level of support, a reasonable modicum of support from the electorate to get on the ballot. So New York, after nearly a century, updated their laws as part of a package of campaign finance and other laws that they had made to proportionally increase the requirements for both party status and to get on the ballot as an independent candidate if you are not a party. So currently, to get on the presidential or statewide ballot in New York, a political organization needs only 2 percent or 130,000 votes in a single election every two years to become a party or to obtain nominating signatures from less than one-third of 1 percent of the 13.5 million registered voters in New York. This is not a big ask, and in no way... But you do acknowledge, though, that these restrictions, I mean, this is a more restrictive system than previously. Yes, the original laws were enacted, the independent signature requirement was in 1922. Right. Can I just say, in your brief, you note that, and I'm not so persuaded by that because of the fact that the number went up and then came back down. So it's not as if, oh, it's been 15,000 and now it's 80 years later, so of course it's going to go up. It went up and then it went back down to 15,000 as recently as, I guess, 30 years ago. So it's not the proportionality in the fact that it was 15,000 in 1922 and it should be way more than that now. Personally, I'm not so compelled by that. Okay. And the nominating petition requirements have varied over time. The party requirement has not. That has stayed the same since 1935. In 1935, it was 50,000 votes when there were less than 5 million registered voters in the state of New York. They raised it to 130,000 when there's been an increase up to 13.5 million registered voters in New York. Contrary to what my colleague said, the law is not murky in this area. It's thoroughly supported by the Supreme Court and Second Circuit precedent, which have routinely upheld much higher party qualification requirements and signature requirements of up to 5% of the relevant voter pool. Can I ask you, I'm glad you raised that, that one of the things at issue, this question of how we determine how much of a burden is too much of a burden, and so to the extent there are these comparisons to restrictions that have been imposed in other states, what we are to make of that? I assume your position is not that it's purely a numbers comparison game, and if that is not the case, what other kinds of things should we be looking at? Well, most of the courts do conduct that comparison. They look at other states' laws. They conduct a comparison in the same party in the related case. This circuit had done that same analysis. They found that New York's party qualification requirement was, quote, in the middle of the pack nationally and noted that the Supreme Court and other circuits have upheld far higher requirements, 3%, which was considered by the commission, and they ultimately landed on 2% for the party qualification requirement, 4%, 5%, 10%, even 20% in the Supreme Court in the case of Janus v. Fortson. So we have New York's requirement for party qualification is much lower than in many other places. The reality is it is still far easier to become and remain a recognized political party, which has a defined meeting in the state of New York, as opposed to an independent body, those parties that can't reach that threshold. Is your position that the concern, the focus really is on this question of party access as opposed to candidate access? I'm curious as to this idea that minor parties that are fusion parties, so-called fusion parties, are able to get on the ballot. Should we be concerned by the fact that, yes, these are minor parties, but they're still putting on the major party candidates on the ballot? Well, I think it's an important point that you raise. One, when the courts look at these laws, they look at the totality. They look at both the party status requirement and the ballot access requirement. So they will look at the totality of the law to determine whether there is a, quote, virtual exclusion from the ballot, noting that if you can't reach the modest threshold of 2% in the state of New York to be a party, you do have another avenue to get on the ballot, and that's by independent nominating petitions. Contrary to what my colleague said, there are very recent examples of people, not celebrities, not billionaires, not household names that have met this petition requirement, even though it's brand new. Independent Senate candidate Diane Sayre, not a billionaire, not a celebrity, she submitted over 64,000 signatures for her Senate run this year. She will be on the general election ballot. The SAM party, the related party in this case, as of November 2020, they had 649 registered members. They submitted 45,000 signatures to get on the ballot in their run for governor in 2018. This is not an impossible burden. Again, when the SAM party in the prior case, when they upheld that requirement and said that a reasonably diligent party can be expected to meet this threshold, they were just relying on Supreme Court precedent in Janus upholding a 5% requirement and Storer saying that 325,000 signatures is not an excessive requirement. The White case, the American Party of Texas versus White, which had a somewhat similar requirement, a 1% requirement over 55 days, they said they were unimpressed with the arguments about how onerous that was. And there's also another recent Second Circuit case that directly dealt with this issue. That is LaRoche versus Keiser. That looked at a Connecticut law that required 466 signatures over a 14-day period. In a state with one-fifth of the population and one-fifth of the registered voters in New York. And that circuit, again, looking at Janus, looking at Storer, looking at White, all said, yes, this is not an unconstitutional burden. That requirement is far more proportionally than New York's currently is. Is it your view that so long as a signature requirement passes constitutional muster, it doesn't matter what the past performance threshold is? I think the courts need to look at the totality of the election law and determine whether such a severe burden has been put for somebody to have access to the ballot. So you can have access to the ballot as a recognized party. You get so-called automatic access. Or you can have access to the ballot if you can't reach that threshold. I understand. There are two ways. And what I'm asking you is whether you think the signature route, if it's deemed to be constitutional, ends the case. I don't know that it ends the case because I think that there can be a point. I mean, the Supreme Court has held a requirement that you need to have 20 percent of the vote to be a recognized party, which is 10 times higher than New York. There might be a point. It hasn't been addressed by the Supreme Court or other circuits where that might be deemed excessive. But New York is certainly, again, the Second Circuit recently noted. But they're related. In other words, in deciding whether the past performance standard is too high, you take a look at the signature to see if it's okay. Yeah, I mean, there is no past performance standard. I mean, in this case, there's a long history of even Appendix B to appellant's brief shows 34 instances of so-called non-fusion parties meeting the 2 percent threshold. There's no past requirement. I mean, the question is, is the standard set too high where it creates a severe burden for ballot access in its totality? And I think, you know, the court analyzed each of these separately. It analyzed them all together. The Second Circuit made it clear that they were looking at everything collectively in the totality. Once we look at it all, as you suggest, is our review standard for First Amendment purposes strict scrutiny? No. Strict scrutiny would only apply if the court determines that the requirement has been set so that there is virtual exclusion from the ballot. Here, again, the court has already found, and I don't know what my colleague is looking for when he says that they need more evidence. This isn't a case where the court did not conduct a judicial analysis. We have a commission report. We have a detailed declaration. We have a lengthy history of election results in the state of New York showing minor parties, fusion and non-fusion alike, meeting the threshold in virtually every election in the past 25 years. And if I may, just to make one quick point, there is no distinction under the law between so-called fusion and non-fusion parties. At summary judgment argument, counsel for appellants was asked point blank if there was any authority for the proposition that so-called fusion and non-fusion parties should be treated differently in enacting ballot access laws. The answer is that there's not. The Supreme Court has made it clear that states are not required to cater their election laws to a party's chosen strategy. The Libertarian Party itself cross-nominated multiple candidates in the 2020 election. So it's their own decision as to which races they choose to cross-nominate candidates and which races they choose to run their own candidates. The constitutionality of New York's laws does not turn on the Libertarian Party's or the Green Party's chosen decisions as to which candidates they're going to run in a particular election. All right. Thank you. Thank you very much. Yes, Mr. Ostrowski. To answer the previous point, if you look at Anderson, it talks about our primary concern is with the tendency of ballot access restrictions to limit the field of candidates from which voters might choose. So I think that does provide Supreme Court precedent for the importance of not just having the same candidate on the ballot in two lines saying the same thing, but to have a diversity of candidates because, again, as Anderson talks about, the voters have an interest in this, too, of hearing ideas that are not being expressed by the major parties. And although it's true that on occasion the Libertarians have cross-nominated, over its history it's been quite rare. And there's just no way the Libertarians are going to nominate either with all due respect to them. Both major party candidates are so far from their platform that they would have to go out of business to nominate them. And the Green Party, I believe, has a policy of not engaging in fusion. So that is a relevant consideration. I think maybe the central error of the trial court to say, well, we're going to count the fusion as showing how easy it is to get on the ballot. But the fact of the matter is it's not creating any ideological issue-oriented policy information for the voters. And to answer Judge Newman's question, I think both prongs matter because in New York it's difficult to get on the ballot, but if you become a permanent party you have all these advantages. It's much easier to get on the ballot. It becomes a matter of a few signatures. So I think that both prongs matter. But does it matter to the constitutional analysis? Because my understanding of what Judge Newman was suggesting was this idea of even if we were persuaded that the party qualifications were too strict, if in fact the nominating petition route is fine and constitutional, is that good enough? Well, it's kind of like having to build the same house every four years. The Democrats and Republicans don't have to do that. They have these advantages of much easier ballot access. So I think the court- Well, I mean, clearly a petition system is allowable. And so the idea is whether or not New York's system as a whole is constitutional, and it's made up of these various components. But we find that one component of it, in fact, does satisfy the constitutional need for ballot-slash-party access. I wouldn't disagree with your characterization. My only point is that you can get all the signatures you want, but unless you meet the permanent party standard, you're going to be back at it for another laborious, expensive trip to door-to-door to get signatures four years from now. Why is that a problem, though? That's the nature of- I mean, if the system is constitutional and it means that parties have to, every four years or every two years, go through this petition- Because I think the cases cited in our brief show that the system can't be constructed so that it favors the two major parties. And I think that would be- as far as the one exception, the Senate candidate, I would just say that's the exception that proves the rule. Thank you, Your Honor. Thank you. We'll take the case under advisement.